**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| HUNTER STEPHENS,<br>*Plaintiff*,<br><br>v.<br><br>ESPN PRODUCTIONS, INC., ESPN, INC., THE WALT DISNEY COMPANY in their official capacities; CHRIS CALCINARI, BROOKE LEONE, JAMES PITARO, BOB IGER, BOB CHAPEK, DERICA W. RICE, SUSAN E. ARNOLD, FRANCIS A. DESOUSA and DOES 1 through 10, inclusive, in their individual capacities. individually and in her official capacity,<br>*Defendants*. | No. 3:25-cv-1286 (VAB) |

**RULING AND ORDER ON MOTION TO DISMISS AND MOTION TO STRIKE**

Mr. Hunter Stephens ("Plaintiff") has sued ESPN Productions, Inc., ESPN, Inc., The Walt Disney Company ("Disney"), Chris Calcinari, Brooke Leone, James Pitaro, Bob Iger, Bob Chapek, Derica W. Rice, Susan E. Arnold, and Francis A. deSouza (collectively, the "Defendants"), alleging that the Defendants' termination of his employment for noncompliance with a booster requirement violated his rights under the Religious Freedom Restoration Act and constituted a breach of contract under Connecticut common law. Compl., ECF No. 1 ("Compl.").

The Defendants move to dismiss and to strike the Complaint. Defs.' Mot. to Dismiss and Mot. to Strike, ECF No. 32; Defs.' Mem. of L. in Supp. of Mot. to Dismiss and Mot. to Strike, ECF No. 32-1 ("Defs.' Mem.").

For the following reasons, the Defendants' motion to dismiss is **GRANTED**, and their motion to strike is **DENIED as moot**.

The claims against The Walt Disney Company, Bob Iger, Bob Chapek, Derica W. Rice, Susan E. Arnold, and Francis A. deSouza are **DISMISSED** without prejudice under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction. The breach-of-contract and RFRA claims are otherwise **DISMISSED** without prejudice under Federal Rule of Civil Procedure 12(b)(6).

To the extent the deficiencies described in this Ruling and Order can be remedied, a proposed Amended Complaint must be filed by **September 11, 2026**. If a proposed Amended Complaint is not filed by **September 11, 2026**, the claims will dismissed with prejudice.

## I. FACTUAL AND PROCEDURAL BACKGROUND

### A. Factual Allegations

On August 28, 2016, Mr. Stephens allegedly entered into an employment agreement with ESPN Productions, Inc. to work as a Remote Video Operator. Compl. ¶ 24. On August 28, 2019, the parties allegedly renewed the agreement through August 27, 2021. *Id.* ¶ 25.

On June 14, 2021, EPSN Productions Inc. allegedly exercised its option to extend the contract for an additional year, through August 27, 2022. *Id.* ¶ 26; Ex. B, at 2, Compl. Mr. Stephens alleges that the contract extension did not require him to be "fully vaccinated" or to receive a third dose[1] of any COVID-19 vaccine as a condition of continued employment. Compl. ¶¶ 20, 27. Mr. Stephens further alleges that the extension allegedly provided that his "day count" would be contingent upon him becoming "fully vaccinated." *Id.* ¶ 27. Mr. Stephens alleges that he satisfied this status by receiving two doses of the Moderna vaccine. *Id.*

On January 12, 2022, Mr. Stephens allegedly submitted a formal request for a religious exemption from the booster requirement. *Id.* ¶ 31; Compl., Ex. C, at 2. He alleges that, after

[1] Also referred to as a "booster" shot. Compl. ¶ 23.

receiving his second dose of the Moderna vaccine, he learned that fetal cell lines had been used in the development or testing of all three FDA-approved COVID-19 vaccines. Compl. ¶¶ 21–22, 32; Compl., Ex. C, at 3–4. As a devout Christian, Mr. Stephens allegedly believed that using a product developed or tested with aborted fetal cells was morally objectionable. *Id.*

On February 3, 2022, ESPN Employee Relations Manager Brooke Leone allegedly denied Mr. Stephens's exemption request without engaging in an interactive process, stating that ESPN could not conclude that his beliefs were sincerely held. Compl. ¶ 35; Compl., Ex. D, at 3.

On February 14, 2022, Mr. Stephens's employment allegedly was terminated by e-mail from ESPN Senior Vice President of Remote Production Operations Chris Calcinari and Ms. Leone. Compl. ¶¶ 18, 36. Mr. Stephens alleges that he was terminated because he had received only two doses of the Moderna vaccine and had not received a third, or "booster," dose. *Id.* ¶ 19. He further alleges that ESPN's corporate policies were substantially guided by Disney, which allegedly promoted and enforced vaccination requirements across its subsidiaries. *Id.* ¶ 36.

Mr. Stephens alleges that the Defendants' actions constitute "state action", notwithstanding that ESPN and Disney are private corporations. *Id*. ¶¶ 37-108. In support, Mr. Stephens cites Disney's alleged reference to the Biden Administration's September 2021 vaccine directive, *id*. ¶¶ 37-38; an alleged historical relationship between Disney and the U.S. Department of Defense dating to World War II, *id*. ¶¶ 39-58; the backgrounds of certain Disney board members, *id*. ¶¶ 61-70; and Disney and ESPN's alleged participation in a COVID-19 public-awareness campaign with Ad Council, the Center for Disease Control and Prevention ("CDC"), and the U.S. Department of Health and Human Services, *id*. ¶¶ 91-108. Mr. Stephens alleges that these alleged relationships establish the nexus required for state action. *Id*. ¶ 38.

Mr. Stephens alleges that the Defendants' conduct constitutes "state action," notwithstanding that ESPN and Disney are private corporations. *Id.* ¶¶ 37–108. In support of this theory, he relies on Disney's alleged reference to the Biden Administration's September 2021 vaccination directive, *id.* ¶¶ 37–38; Disney's alleged historical relationship with the United States Department of Defense dating to World War II, *id.* ¶¶ 39–58; the professional backgrounds of certain Disney directors and executives, *id.* ¶¶ 61–70; and Disney and ESPN's alleged participation in a COVID-19 public-awareness campaign with the Ad Council, the Centers for Disease Control and Prevention ("CDC"), and the United States Department of Health and Human Services, *id.* ¶¶ 91–108.

Mr. Stephens alleges that these relationships establish the nexus required to attribute the Defendants' conduct to the federal government. *Id.* ¶ 38.

### B. Procedural History

On August 12, 2025, Mr. Stephens filed the Complaint. Compl.

On November 17, 2025, the Defendants filed a motion to dismiss and a motion to strike. Defs.' Mot. to Dismiss and Mot. to Strike, ECF No. 32. The Defendants also filed a memorandum in support of their motions. Defs.' Mem.

On January 5, 2026, Mr. Stephens filed an opposition to the motion to dismiss and motion to strike. Pl.'s Mem. of L. in Opp'n to Defs.' Mot. to Dismiss and Mot. to Strike, ECF No. 38 ("Opp'n").

On February 2, 2026, the Defendants filed a reply. Reply to Pl.'s Obj. to Defs.' Mot. to Dismiss and Mot. to Strike, ECF No. 39 ("Defs.' Reply").

## II. STANDARD OF REVIEW

### A. 12(b)(2)

On a motion to dismiss for lack of personal jurisdiction under Federal Rule of Civil Procedure 12(b)(2), the "plaintiff bears the burden of showing that the court has jurisdiction over the defendant." *In re Magnetic Audiotape Antitrust Litig*., 334 F.3d 204, 206 (2d Cir. 2003). The plaintiff therefore must make a prima facie showing that jurisdiction exists. *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012).

"This prima facie showing must include an averment of facts that, if credited by the ultimate trier of fact, would suffice to establish jurisdiction over the defendant." *Id*. (internal quotation marks omitted); *see also Glenwood Sys., LLC v. Med-Pro Ideal Sols., Inc*., No. 3:09-cv-956 (WWE), 2010 WL 11527383, at *2 (D. Conn. May 4, 2010) ("At this stage of the proceedings, if the court relies upon pleadings and affidavits, the plaintiff must make out only a prima facie showing of personal jurisdiction, and the affidavits and pleadings should be construed most favorably to the plaintiff."), *aff'd*, 438 F. App'x 27 (2d Cir. 2011) (citing *CutCo Indus., Inc. v. Naughton*, 806 F.2d 361, 365 (2d Cir. 1986)). A court considers the facts as they existed when the plaintiff filed the complaint. *See id*. (citing *Klinghoffer v. S.N.C. Achille Lauro Ed Altri-Gestione Motonave Achille Lauro in Amministrazione Straordinaria*, 937 F.2d 44, 52 (2d Cir. 1991)).

### B. 12(b)(6)

To survive a motion to dismiss under 12(b)(6), a complaint must contain a "short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a). Any claim that fails "to state a claim upon which relief can be granted" will be dismissed. Fed. R. Civ. P. 12(b)(6). In reviewing a complaint under Rule 12(b)(6), a court applies a "plausibility

standard" guided by "[t]wo working principles." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

First, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*; *See also Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) ("While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations . . . a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." (internal citations omitted)). Second, "only a complaint that states a plausible claim for relief survives a motion to dismiss." *Iqbal*, 556 U.S. at 679. Thus, the complaint must contain "factual amplification . . . to render a claim plausible." *Arista Records LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (quoting *Turkmen v. Ashcroft*, 589 F.3d 542, 546 (2d Cir. 2009)).

When reviewing a complaint under Federal Rule of Civil Procedure 12(b)(6), the court takes all factual allegations in the complaint as true. *Iqbal*, 556 U.S. at 678. The court also views the allegations in the light most favorable to the plaintiff and draws all inferences in the plaintiff's favor. *Cohen v. S.A.C. Trading Corp.*, 711 F.3d 353, 359 (2d Cir. 2013); *See also York v. Ass'n of the Bar of N.Y.*, 286 F.3d 122, 125 (2d Cir. 2002) ("On a motion to dismiss for failure to state a claim, we construe the complaint in the light most favorable to the plaintiff, accepting the complaint's allegations as true.").

A court considering a motion to dismiss under Rule 12(b)(6) generally limits its review "to the facts as asserted within the four corners of the complaint, the documents attached to the complaint as exhibits, and any documents incorporated in the complaint by reference." *McCarthy v. Dun & Bradstreet Corp.*, 482 F.3d 184, 191 (2d Cir. 2007). A court may also consider "matters of which judicial notice may be taken" and "documents either in plaintiffs' possession

or of which plaintiffs had knowledge and relied on in bringing suit." *Brass v. Am. Film Techs., Inc.*, 987 F.2d 142, 150 (2d Cir. 1993); *Patrowicz v. Transamerica HomeFirst, Inc.*, 359 F. Supp. 2d 140, 144 (D. Conn. 2005).

A plaintiff's "[f]actual allegations must be enough to raise a right to relief above the speculative level" and assert a cause of action with enough heft to show entitlement to relief and "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 555, 570. A claim is facially plausible if "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

Although the Federal Rules of Civil Procedure do not require "detailed factual allegations," a complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement." *Twombly*, 550 U.S. at 555–57. Plausibility at the pleading stage is nonetheless distinct from probability, and "a well-pleaded complaint may proceed even if it strikes a savvy judge that actual proof of [the claim] is improbable, and . . . recovery is very remote and unlikely." *Id.* at 556 (internal quotation marks omitted).

**C. 12(f)**

Rule 12(f) of the Federal Rules of Civil Procedure provides that a court "may strike from a pleading any insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). Resolution of a Rule 12(f) motion is within the discretion of the district court, and such motions are generally disfavored and should be infrequently granted. *Tucker v. Am. Int'l Grp., Inc.*, 936 F. Supp. 2d 1, 15–16 (D. Conn. 2013).

"'Immaterial' matter is that which has no essential or important relationship to the claim for relief, and 'impertinent' material consists of statements that do not pertain to, and are not necessary to resolve, the disputed issues." *Brady v. Basic Research, L.L.C.*, 101 F. Supp. 3d 217, 225 (E.D.N.Y. 2015) (citation omitted). "A scandalous allegation is one that reflects unnecessarily on the defendant's moral character, or uses repulsive language that detracts from the dignity of the court." *Id*. (citation omitted).

"To prevail on a 12(f) motion, the moving party must demonstrate that: '(1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant.'" *Id*. (quoting *Roe v. City of New York*, 151 F. Supp. 2d 495, 510 (S.D.N.Y. 2001)). A showing of prejudice is a necessary part of a Rule 12(f) motion to strike. *See Gssime v. Nassau Cnty.*, No. 09-CV-5581(JS)(ARL), 2014 WL 810876, at *2 (E.D.N.Y. Feb. 28, 2014) (collecting cases).

The Second Circuit has long held that courts "should not tamper with the pleadings unless there is a strong reason for so doing," and that a motion to strike under Rule 12(f) should be denied "unless it can be shown that no evidence in support of the allegation would be admissible." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976).

## III. DISCUSSION

The Defendants seek dismissal of the Complaint on several grounds.

First, they argue that the Court lacks personal jurisdiction over The Walt Disney Company ("Disney") and Defendants Bob Iger, Bob Chapek, Derica W. Rice, Susan E. Arnold, and Francis A. deSouza. Defs.' Mem. at 26–32 (arguing that Disney and the nonresident Individual Defendants are not "at home" in Connecticut and that the Complaint alleges **no**

"purposeful suit-related conduct" by Disney in Connecticut and no "purposeful, suit-related contact" between the nonresident Individual Defendants and Connecticut).

Second, they argue that Mr. Stephens has failed to state a breach-of-contract claim because ESPN Productions, Inc. ("Productions") had "the express contractual right" to require him to receive a booster and terminate his employment for noncompliance, and because "none of the Defendants other than Productions is a party to that employment agreement." *Id*. at 1–2; *see also id*. at 8–13 (arguing that the Employment Agreement required Mr. Stephens to comply with Productions' policies and instructions, which could be changed "from time to time," and that "only parties to a contract may be held liable for its breach").

Third, they argue that Mr. Stephens has failed to state a claim under the Religious Freedom Restoration Act ("RFRA") because "no alleged facts in the Complaint render it plausible that [the Defendants] acted under color of federal law when Productions applied the COVID-19 booster requirement to Stephens and then terminated his employment when he refused to comply." *Id*. at 13; *see also id*. at 14–24 (arguing that the federal government did not "manage, control, or coerce" the corporate Defendants, that the Defendants did not perform functions traditionally and exclusively reserved to the government, and that the Complaint identifies no "agreement or meeting of the minds" between the Defendants and the federal government).

Fourth, the Defendants argue that, even if the Individual Defendants could be considered federal actors, they are "all entitled to qualified immunity" because no then-existing precedent made it "beyond debate" that their alleged conduct violated RFRA. *Id*. at 24–26.

Finally, the Defendants request that, if the Complaint is not dismissed, the Court strike Paragraphs 37 through 108 under Federal Rule of Civil Procedure 12(f). *Id*. at 6, 32–34

(characterizing those allegations as "superfluous, immaterial, and prejudicial" and arguing that they "have no bearing on the issues in the case").

The Court addresses each issue in turn.

**A. Personal Jurisdiction: the Walt Disney Company**

In a diversity action, or a federal-question action in which the governing federal statute does not provide for nationwide service of process, "a federal court applies the forum state's personal jurisdiction rules." *American Wholesalers Underwriting, Ltd. v. American Wholesale Insurance Group, Inc.*, 312 F. Supp. 2d 247, 251–52 (D. Conn. 2004) (quoting *PDK Labs, Inc. v. Friedlander*, 103 F.3d 1105, 1108 (2d Cir. 1997)). The Court therefore conducts a two-step inquiry. "First, the plaintiff has the burden of showing that the state's long-arm statute authorizes the exercise of personal jurisdiction." *Id.* at 252. "If the defendant is subject to jurisdiction under the terms of the applicable long-arm statute, then the court must also consider whether the exercise of jurisdiction satisfies due process." *Id.*; *see also Waldman v. Palestine Liberation Organization*, 835 F.3d 317, 327 (2d Cir. 2016).

Before discovery or an evidentiary hearing, "a plaintiff may defeat a motion to dismiss based on legally sufficient allegations of jurisdiction and by making a prima facie case of jurisdiction." *American Wholesalers*, 312 F. Supp. 2d at 251. In evaluating that showing, "the court construes any factual averments and resolves all doubts in the plaintiff's favor." *Id.* At the same time, "'[e]ach defendant's contacts with the forum State must be assessed individually.'" *Bucchere v. Brinker International, Inc.*, 49 Conn. Supp. 441, 445–46 (Super. Ct. 2005) (quoting *Keeton v. Hustler Magazine, Inc.*, 465 U.S. 770, 781 n.13 (1984)).

Connecticut General Statutes § 33-929(f) provides that "[e]very foreign corporation shall be subject to suit in this state" on any cause of action arising, among other things, "(1) [o]ut of

any contract made in this state or to be performed in this state"; "(2) [o]ut of any business solicited in this state by mail or otherwise if the corporation has repeatedly so solicited business"; or "(4) [o]ut of tortious conduct in this state, whether arising out of repeated activity or single acts, and whether arising out of misfeasance or nonfeasance." Conn. Gen. Stat. § 33-929(f). The statute requires consideration of both the plaintiff's cause of action and the defendant's own connection with Connecticut because "it is the totality of the defendant's conduct and connection with this state that must be considered, on a case by case basis, to determine whether the defendant could reasonably have anticipated being haled into court here." *American Wholesalers*, 312 F. Supp. 2d at 252 (quoting *Lombard Bros., Inc. v. General Asset Management Co.*, 190 Conn. 245, 255 (1983)).

The Connecticut activities of a subsidiary ordinarily cannot be attributed to a foreign parent corporation merely because of the corporate relationship. As the Connecticut Appellate Court explained, "the parent corporation and its subsidiary are treated as separate and distinct legal persons even though the parent owns all the shares in the subsidiary and the two enterprises have identical directors and officers." *Hersey v. Lonrho, Inc.*, 73 Conn. App. 78, 83–84 (2002) (quoting *SFA Folio Collections, Inc. v. Bannon*, 217 Conn. 220, 232 (1991)). Likewise, "the mere incidence of 'stock ownership in or affiliation with a corporation, without more, is not a sufficient minimum contact'" to support jurisdiction over a nonresident parent corporation. *Id.* at 84 (quoting *Central States, Southeast & Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 943 (7th Cir. 2000)).

Indeed, "[w]here corporate formalities are substantially observed and the parent does not dominate the subsidiary, a parent and a subsidiary are two separate entities and the acts of one cannot be attributed to the other." *Hersey*, 73 Conn. App. at 85 (quoting *Central States*, 230 F.3d

at 944). As a result, "before [a long-arm] statute can be utilized as a basis for the exercise of jurisdiction over the [nonresident] foreign corporation, the corporate veil must be pierced so that acts of the domestic subsidiary can be imputed to the absent parent." *Id.* at 86 (quoting *McPheron v. Penn Central Transportation Co.*, 390 F. Supp. 943, 949 (D. Conn. 1975)).

Under the instrumentality rule, veil piercing requires "[c]ontrol, not mere majority or complete stock control, but complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own." *Hersey*, 73 Conn. App. at 87. The plaintiff also must establish that "such control must have been used by the defendant to commit fraud or wrong, to perpetrate the violation of a statutory or other positive legal duty, or a dishonest or unjust act in contravention of plaintiff's legal rights," and that "the aforesaid control and breach of duty must proximately cause the injury or unjust loss complained of." *Id.* The identity rule likewise requires "such a unity of interest and ownership that the independence of the corporations had in effect ceased or had never begun." *Id.* Because veil piercing is an equitable doctrine, courts should pierce the corporate veil only under "exceptional circumstances." *Id.*

Ordinary incidents of corporate ownership do not satisfy these standards. In *Hersey*, the Appellate Court held that overlapping boards of directors were "insufficient to establish the parent's domination or control of the subsidiary beyond that which normally is associated with the incidence of corporate ownership." 73 Conn. App. at 88. The court further explained that "'100% stock ownership and commonality of [officers and directors] are not alone sufficient to establish an alter ego relationship between two corporations.'" *Id.* (quoting *Insolia v. Philip Morris, Inc.*, 31 F. Supp. 2d 660, 669 (W.D. Wis. 1998)). Similarly, "[m]ere ownership by a

parent corporation of a subsidiary corporation present in the forum state generally will not subject the parent to personal jurisdiction in that forum," even when the separation between parent and subsidiary is "'merely formal,' as long as it is 'real.'" *American Wholesalers*, 312 F. Supp. 2d at 257 (quoting *Savage v. Scripto-Tokai Corp.*, 147 F. Supp. 2d 86, 93 (D. Conn. 2001)).

These principles do not foreclose jurisdiction when the parent corporation's own conduct independently satisfies the long-arm statute. As the court explained in *Bucchere*, "because the plaintiffs here claim that the named defendant's in-state activities subject it to this court's jurisdiction, there is no need to pierce the corporate veil." 49 Conn. Supp. at 445. There, the court concluded that "[t]here can be no doubt that employees of the named defendant wrote the documents that governed what their Connecticut restaurant managers knew of the act and those managers' responsibilities under that law." *Id.* at 450–51. Likewise, in *Roller Bearing Co. of America, Inc. v. American Software, Inc.*, the court held that "[t]his request for payment of the additional user fee—which is the very act that prompted RBC to file its complaint—is sufficient to satisfy the relevant Connecticut long-arm statute." 570 F. Supp. 2d 376, 391 (D. Conn. 2008).

The Defendants argue that Disney is not subject to general jurisdiction because it "is incorporated in the State of Delaware and maintains its principal place of business in the State of California," and therefore is not "at home" in Connecticut. Defs.' Mem. at 27–28 (quoting *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 413 (2017) (explaining that a corporation is ordinarily "at home" in its state of incorporation and the state in which it maintains its principal place of business)). They further argue that the Court lacks specific jurisdiction because Mr. Stephens has not alleged that the 2019 Agreement was "made in" or "performed" in Connecticut, that Disney "engaged in any tortious conduct in Connecticut," or that any Disney "suit-related conduct"

occurred in Connecticut. *Id.* at 28–30. They also contend that ESPN's or Productions' Connecticut contacts cannot establish jurisdiction over Disney because "[t]he presence of the subsidiary alone does not establish the parent's presence in the state." *Id.* at 29–30 (quoting *Jazini v. Nissan Motor Co.*, 148 F.3d 181, 184 (2d Cir. 1998)).

Mr. Stephens responds that his jurisdictional theory does not rest solely on Disney's status as a parent corporation, but on Disney's alleged "unqualified transaction of business in Connecticut and its direct control over the employment policies enforced against ESPN employees working in this forum." Opp'n at 38. He contends that Disney "exercised control over the employment relationship at issue," "implemented and enforced the vaccination policy challenged in this action as applied to ESPN employees working in Connecticut," and "otherwise engaged in suit-related conduct that gives rise to Plaintiff's claims." *Id.* He further argues that, taken together, these allegations establish that Disney "purposefully directed its conduct at Connecticut," exercised "operational control over the employment relationship at issue," and caused the denial of his religious exemption and the termination of his employment to occur in Connecticut. *Id.* at 39. Finally, Mr. Stephens relies on the Agreement's statement that, "[f]or purposes of the rights granted herein and the entities for which services are performed, 'Productions' includes Productions' parent, affiliated and subsidiary companies," and argues that this language "identifies Disney as a functional party to the employment relationship rather than a nonconsenting outsider." *Id.* at 40.

In reply, the Defendants maintain that Disney "was only a third-party beneficiary" of the 2019 Agreement and that Mr. Stephens has alleged no facts showing that Disney had a "right to control the means and methods of" his work or that "exceptional circumstances" warrant piercing Productions' corporate veil. Defs.' Reply at 9–10. They further argue that "Calcinari's

supposed employment with [Disney] and Defendants Chapek's and Iger's alleged nationally televised statements and company-wide policy-setting do not confer personal jurisdiction over [Disney]." *Id.* at 10. According to the Defendants, "[c]ourts generally treat a parent corporation and its subsidiaries as separate and distinct legal entities," Defs.' Mem. at 11 (quoting *Tucker v. American International Group, Inc.*, 745 F. Supp. 2d 53, 69–70 (D. Conn. 2010)), and Mr. Stephens has not alleged facts permitting ESPN's or Productions' Connecticut contacts to be attributed to Disney. Defs.' Reply at 9–10. They also argue that "[c]onduct directed nationwide or for managing internal corporate affairs, even if it incidentally impacts Connecticut, is not 'transacting business' under the long-arm statute," and that Disney cannot be considered "'at home'" in Connecticut merely because an affiliated entity conducts business there. *Id.* at 10 (citing *Daimler AG v. Bauman*, 571 U.S. 117, 139 (2014) (rejecting an approach that would render a corporation subject to general jurisdiction in every state in which its sales were sizable)).

The Court agrees.

The Complaint does not allege facts establishing general jurisdiction over Disney. Disney is neither incorporated nor headquartered in Connecticut, and its alleged ownership of ESPN and affiliation with businesses operating in Connecticut do not, without more, render Disney "at home" in Connecticut. *BNSF Ry. Co. v. Tyrrell*, 581 U.S. 402, 413 (2017) (explaining that the "paradigm" forums in which a corporation is "at home" are its place of incorporation and principal place of business). Nor may general jurisdiction rest on Disney's alleged ownership of or affiliation with entities operating in Connecticut because "the mere incidence of 'stock ownership in or affiliation with a corporation, without more, is not a sufficient minimum contact'" to support jurisdiction over a nonresident parent corporation. *Hersey v. Lonrho, Inc.*, 73

Conn. App. 78, 84 (2002) (quoting *Central States, Southeast & Southwest Areas Pension Fund v. Reimer Express World Corp.*, 230 F.3d 934, 943 (7th Cir. 2000)).

Mr. Stephens also has not made a prima facie showing that Connecticut General Statutes § 33-929(f) authorizes specific jurisdiction over Disney. Section 33-929(f)(1) provides that a foreign corporation may be subject to suit on a cause of action arising "[o]ut of any contract made in this state or to be performed in this state." Conn. Gen. Stat. § 33-929(f)(1). The Employment Agreement, however, identifies Productions and Mr. Stephens as the contracting parties. Although the Agreement extends certain rights to Productions' parent, affiliated, and subsidiary companies, the Complaint does not allege that Disney negotiated or executed the Agreement, assumed any obligations under it, or otherwise became a contracting party. The Complaint therefore does not plausibly allege that Mr. Stephens's claims against Disney arise "[o]ut of any contract made in this state or to be performed in this state." *Id.*

A relatively recent decision in *Manka v. Walt Disney Co.* is particularly instructive. There, the plaintiff relied on contractual language defining ESPN to include its "parent, subsidiary, and affiliated companies" in arguing that Disney was itself a party to a contract to be performed in Connecticut. 149 Conn. App. 1, 4–5 (2014) (addressing whether similar language in an ESPN agreement made Disney a party to the agreement for purposes of Connecticut's long-arm statute). The Connecticut Appellate Court affirmed dismissal because "the court's finding that the defendant was not a party to the contract defeats the argument that the cause of action is based on a contract entered into or to be performed in this state." *Id.* at 8. As in *Manka*, the Complaint here alleges no facts showing that Disney became a contracting party merely because the Agreement referenced Productions' parent, affiliated, and subsidiary companies.

The Complaint also does not allege facts permitting Productions' or ESPN's Connecticut contacts to be attributed to Disney. Although the Complaint alleges that Disney owns or is affiliated with those entities, "the mere incidence of 'stock ownership in or affiliation with a corporation, without more, is not a sufficient minimum contact'" to support jurisdiction over a nonresident parent corporation. *Hersey*, 73 Conn. App. at 84 (quoting *Central States*, 230 F.3d at 943). The Complaint does not allege the type of domination required to disregard the separate corporate forms. Under the instrumentality rule, a plaintiff must establish "complete domination, not only of finances but of policy and business practice in respect to the transaction attacked so that the corporate entity as to this transaction had at the time no separate mind, will or existence of its own." *Id.* at 87. The Complaint alleges no such facts regarding Disney's control over Productions in connection with Mr. Stephens's Employment Agreement, exemption request, or termination.

Nor do the allegations justify piercing the corporate veil. Overlapping directors, ordinary corporate ownership, or general policy coordination are "insufficient to establish the parent's domination or control of the subsidiary beyond that which normally is associated with the incidence of corporate ownership." *Id.* at 88. Likewise, there is no basis to disregard the corporate form where there is "no evidence beyond that which would be customary in a parent-subsidiary relationship." *American Wholesalers Underwriting, Ltd. v. American Wholesale Insurance Group, Inc.*, 312 F. Supp. 2d 247, 258 (D. Conn. 2004). The Complaint does not allege that Productions lacked a separate corporate existence or that Disney exercised complete domination over the specific decisions challenged in this action.

More generally, Productions' or ESPN's contacts with Connecticut cannot establish jurisdiction over Disney merely because the entities operate within the same corporate

organization. The Connecticut Supreme Court has explained that "it is the forum contacts of the defendant, not the plaintiff, that are relevant in determining minimum contacts." *North Sails Group, LLC v. Boards & More GmbH*, 340 Conn. 266, 295–96 (2021). A plaintiff therefore cannot establish jurisdiction through "contacts between the plaintiff (or third parties) and the forum [s]tate." *Id.* at 296 (quoting *Walden v. Fiore*, 571 U.S. 277, 284 (2014)). The Complaint contains no allegations establishing that Productions or ESPN acted as Disney's agent in connection with the challenged employment decisions or otherwise created suit-related contacts attributable to Disney itself.

The Court nevertheless considers whether Disney's own alleged conduct independently satisfies Connecticut's long-arm statute. As *Bucchere v. Brinker International, Inc.* explained, "because the plaintiffs here claim that the named defendant's in-state activities subject it to this court's jurisdiction, there is no need to pierce the corporate veil." 49 Conn. Supp. 441, 445 (Super. Ct. 2005). But "[t]here can be no doubt that employees of the named defendant wrote the documents that governed what their Connecticut restaurant managers knew of the act and those managers' responsibilities under that law." *Id.* at 450–51. Similarly, in *Roller Bearing Co. of America, Inc. v. American Software, Inc.*, the parent corporation itself sent the communication giving rise to the dispute, and "[t]his request for payment of the additional user fee—which is the very act that prompted RBC to file its complaint—is sufficient to satisfy the relevant Connecticut long-arm statute." 570 F. Supp. 2d 376, 391 (D. Conn. 2008).

The Complaint alleges no comparable conduct by Disney. Rather, it alleges that Mr. Stephens's employment was terminated by Mr. Calcinari and Ms. Leone "acting in their capacity as agents of ESPN," Compl. ¶ 18; that Mr. Stephens notified ESPN "via Defendants Calcinari and Leone" of his religious objection, *id.* ¶ 23; that Ms. Leone denied his exemption request, *id.*

¶ 35; and that Ms. Leone later terminated his employment, *id.* ¶ 36. Although the Complaint alleges that ESPN's corporate policies "were substantially guided by Disney," *id.*, it does not allege that Disney negotiated or executed Mr. Stephens's Employment Agreement, personally reviewed or denied his exemption request, communicated with him regarding that request, or made the decision to terminate his employment.

Nor do the Complaint's broader allegations regarding Disney's promotion of vaccination policies establish jurisdiction. See *id.* ¶¶ 41–44, 95–101. Unlike in *Bucchere*, the Complaint does not allege that Disney employees created the documents governing the challenged employment decision or the particular policies applied to Mr. Stephens. 49 Conn. Supp. at 450–51 ("There can be no doubt that employees of the named defendant wrote the documents that governed what their Connecticut restaurant managers knew of the act and those managers' responsibilities under that law."). And unlike in *Roller Bearing*, the Complaint does not allege that Disney itself directed into Connecticut the communication or decision giving rise to this lawsuit. 570 F. Supp. 2d at 391 ("This request for payment of the additional user fee—which is the very act that prompted RBC to file its complaint—is sufficient to satisfy the relevant Connecticut long-arm statute."). Allegations that Disney established nationwide corporate policies, made nationally televised statements, or generally promoted vaccination do not establish that Disney itself created a suit-related contact with Connecticut.

Finally, any alleged injury or effect in Connecticut does not itself establish Disney's purposeful availment of this jurisdiction. "[I]t is the forum contacts of the defendant, not the plaintiff, that are relevant in determining minimum contacts." *North Sails*, 340 Conn. at 295–96. Thus, the relevant inquiry is whether Disney itself created suit-related contacts with Connecticut,

not whether an affiliated entity operated in Connecticut or whether the consequences of a decision made by another entity were felt there.

Even construing the Complaint in Mr. Stephens's favor, he has not made a prima facie showing that his claims arise from a contract made by Disney or to be performed by Disney in Connecticut, tortious conduct committed by Disney in Connecticut, or other suit-related conduct undertaken by Disney itself. Because Mr. Stephens has not established that Connecticut General Statutes § 33-929(f) authorizes the exercise of personal jurisdiction over Disney, "there is no need to engage in a constitutional analysis." *Manka*, 149 Conn. App. at 9 n.10.

Accordingly, the motion to dismiss the claims against Disney under Rule 12(b)(2) will be granted.

**B. Personal Jurisdiction: the Nonresident Individual Defendants**

Connecticut General Statutes § 52-59b(a) provides that, "[a]s to a cause of action arising from any of the acts enumerated in this section, a court may exercise personal jurisdiction over any nonresident individual . . . who in person or through an agent: (1) [t]ransacts any business within the state; (2) commits a tortious act within the state . . . ; [or] (3) commits a tortious act outside the state causing injury to person or property within the state" under the circumstances specified in the statute. Conn. Gen. Stat. § 52-59b(a). When a nonresident individual challenges personal jurisdiction, "the plaintiff bears the burden of presenting evidence sufficient to establish jurisdiction." *Matthews v. SBA, Inc.*, 149 Conn. App. 513, 543 (2014). The Court first must determine whether Connecticut's long-arm statute authorizes jurisdiction and, only if the statutory requirements are satisfied, whether exercising jurisdiction would violate due process. *Id.* at 543 ("The trial court must first decide whether the applicable state long-arm statute authorizes the assertion of jurisdiction over the [defendant]. If the statutory requirements [are]

met, its second obligation [is] then to decide whether the exercise of jurisdiction over the [defendant] would violate constitutional principles of due process." (internal quotation marks omitted)).

To establish jurisdiction under Connecticut General Statutes § 52-59b(a), a plaintiff must allege facts showing that each nonresident defendant, "in person or through an agent," committed at least one of the acts enumerated in the statute and that the cause of action "aris[es] from" that defendant's conduct. Conn. Gen. Stat. § 52-59b(a). Generalized allegations against multiple defendants are insufficient to establish personal jurisdiction. In *Matthews*, the Connecticut Appellate Court held that a plaintiff must plead "specific, and not simply conclusory, allegations" establishing jurisdiction "over a specific defendant." *Matthews*, 149 Conn. App. at 552. The court therefore rejected "group allegations that fail to specify the tortious conduct in which any particular individual defendant engaged." *Id.* at 553.

The Defendants argue that Mr. Iger, Mr. Chapek, Mr. Rice, Ms. Arnold, and Mr. deSouza are nonresidents and that the Complaint does not allege that any of them is "domiciled" in Connecticut, which is the place where an individual is ordinarily considered "at home" for purposes of general jurisdiction. Defs.' Mem. at 27 (quoting *Reich v. Lopez*, 858 F.3d 55, 63 (2d Cir. 2017) ("General jurisdiction over an individual comports with due process where he is 'at home,' meaning the place of 'domicile.'")).

They further argue that none of the allegations concerning these Defendants relates to "the conduct that allegedly caused Plaintiff harm: the application of Productions' COVID-19 booster requirement and termination of his employment and employment agreement." *Id.* at 30. According to the Defendants, allegations concerning the individuals' corporate titles, board service, professional histories, or conduct undertaken in their official capacities cannot establish

personal jurisdiction because "personal jurisdiction over a director or officer must be based on conduct apart from acts in the director or officer's official capacity." *Id.* at 31 (quoting *Jarrow Formulas, Inc. v. International Nutrition Co.*, 175 F. Supp. 2d 296, 306 (D. Conn. 2001)). They also contend that the Complaint identifies no purposeful, suit-related contact that any of these individuals personally created with Connecticut. *Id.* at 31 (citing *Walden v. Fiore*, 571 U.S. 277, 284 (2014) (explaining that "the relationship must arise out of contacts that the 'defendant himself' creates with the forum State"); *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 472 (1985) (requiring that the defendant have "'purposefully directed' his activities at residents of the forum" and that the claims "'arise out of or relate to' those activities")).

In response, Mr. Stephens argues that Disney's alleged “direct control in this matter is evidenced by its highly integrated management and HR structure,” which he contends identifies Disney as the functional “decisionmaker responsible for the employment practice” at issue. Opp’n at 43 (quoting *Austen v. Catterton Partners V, LP*, 709 F. Supp. 2d 168, 177 (D. Conn. 2010)). As to Mr. Iger and Mr. Chapek, he argues that their alleged delivery of company-wide mandates “through media centered in Bristol to dictate the ‘means and methods’ of the workforce” establishes “systemic and continuous contact” with Connecticut. *Id.* at 45 (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 466 U.S. 408, 414–15 (1984); *Perkins v. Benguet Consolidated Mining Co.*, 342 U.S. 437 (1952)). More generally, Mr. Stephens contends that the Defendants “purposely directed their activities at residents and employees of Connecticut” and that his alleged injuries “arose out of those activities.” *Id.* Instead, he argues that Disney’s integrated corporate structure and Mr. Iger’s and Mr. Chapek’s alleged participation in company-wide vaccination policies provide sufficient Connecticut contacts at the pleading stage.

The Court disagrees.

The Complaint attributes the employment actions directly affecting Mr. Stephens to Mr. Calcinari and Ms. Leone. It alleges that Mr. Stephens's employment was "unilaterally terminated by" Mr. Calcinari and Ms. Leone "acting in their capacity as agents of ESPN," that they "wanted him to get a third shot," and that Mr. Stephens notified ESPN "via Defendants Calcinari and Leone" of his religious objection. Compl. ¶¶ 18–19, 23. It further alleges that Ms. Leone denied his exemption request and that he was "officially terminated via email by Defendant Leone." *Id.* ¶¶ 35–36.

Although the Complaint alleges more generally that ESPN's corporate policies "were substantially guided by Disney" and that ESPN employees "were repeatedly subjected to Disney's directives regarding COVID-19 compliance," it does not attribute any particular directive concerning Mr. Stephens to Mr. Iger, Mr. Chapek, Mr. Rice, Ms. Arnold, or Mr. deSouza. *Id.* ¶ 36. The Complaint alleges that Mr. Chapek publicly discussed Disney's company-wide vaccination policy and attended a business summit with President Biden, and it describes Mr. Iger's, Mr. Rice's, Ms. Arnold's, and Mr. deSouza's corporate positions, professional histories, or associations with governmental and private entities. *Id.* ¶¶ 8–12, 40–44, 61–72. But it does not allege that any of these five Defendants communicated with Mr. Stephens, reviewed his exemption request, instructed Mr. Calcinari or Ms. Leone, adopted the specific booster requirement applied to him, or participated in the decision to terminate his employment.

Those allegations are insufficient under Connecticut General Statutes § 52-59b(a). The statute authorizes jurisdiction over a nonresident individual only when the cause of action arises from conduct that the individual, "in person or through an agent," undertook within one of the enumerated categories, including "[t]ransact[ing] any business within the state," "commit[ting] a

tortious act within the state," or "commit[ting] a tortious act outside the state causing injury to person or property within the state" while satisfying the statute's additional requirements. Conn. Gen. Stat. § 52-59b(a)(1)–(3) (providing, under subdivision (3), that the nonresident also must regularly conduct or solicit business in Connecticut, engage in another persistent course of conduct in the state, derive substantial revenue from Connecticut goods or services, or "expect[] or should reasonably expect the act to have consequences in the state and derive[] substantial revenue from interstate or international commerce"). Jurisdiction over a corporation therefore does not automatically establish jurisdiction over its officers or directors because "the relevant consideration is their own personal contacts with the forum state." *Mozes ex rel. General Electric Co. v. Welch*, 638 F. Supp. 215, 223 (D. Conn. 1986).

Indeed, "jurisdiction over a corporate director does not automatically emanate from jurisdiction over the corporation itself," and "[p]ersonal jurisdiction must be denied where the contact with the forum state is based solely on allegations of symbiotic relationship rather than individual contacts." *Id.* at 223–24. Consistent with that principle, allegations concerning nonresident directors' official positions are insufficient where "[t]he only contacts which the plaintiff allege[d] that the outside director defendants ha[d] had with Connecticut [were] those stemming from their official capacity as directors of the corporation." *Id.* at 224.

Likewise, the generalized allegations here do not specify any conduct undertaken by any of these specific individual Defendants. *See Matthews*, 149 Conn. App. at 553 ("We agree with the trial court that the plaintiffs' claims rest upon group allegations that fail to specify the tortious conduct in which any particular individual defendant engaged."). Because the Complaint alleges only these Defendants' corporate positions and contains no allegations of Connecticut contacts

attributable to them individually, the Court lacks personal jurisdiction over Mr. Iger, Mr. Chapek, Mr. Rice, Ms. Arnold, and Mr. deSouza.

Accordingly, the claims against these individual Defendants will be dismissed under Rule 12(b)(2).

**C. The Breach-of-Contract Claim**

"The elements of a breach of contract action are the formation of an agreement, performance by one party, breach of the agreement by the other party and damages." *CCT Communications, Inc. v. Zone Telecom, Inc.*, 327 Conn. 114, 133 (2017) (internal quotation marks omitted). "[W]here there is definitive contract language, [however] the determination of what the parties intended by their contractual commitments is a question of law." *Cruz v. Visual Perceptions, LLC*, 311 Conn. 93, 101 (2014) (internal quotation marks omitted). "A contract is unambiguous when its language is clear and conveys a definite and precise intent." *Id.* at 103 (internal quotation marks omitted). In interpreting an agreement, "[t]he contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so." *Harbour Pointe, LLC v. Harbour Landing Condominium Ass'n, Inc.*, 300 Conn. 254, 261 (2011) (internal quotation marks omitted). Moreover, "the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." *Cruz*, 311 Conn. at 103 (internal quotation marks omitted).

"A written contract can be modified by a subsequent parol agreement if that is the intention of the parties." *New England Petroleum Corp. v. Groppo*, 214 Conn. 444, 450 (1990). The parties to a written contract therefore "retain the power to alter or vary or discharge any of its provisions by a subsequent agreement." *Id.* (internal quotation marks omitted). But "[i]n order

to prove that a contract has been modified, the party asserting the modification must show mutual assent to its meaning and conditions." *Joseph General Contracting, Inc. v. Couto*, 317 Conn. 565, 575 (2015) (internal quotation marks omitted).

The Defendants argue that the 2019 Employment Agreement "expressly conditioned" Mr. Stephens's employment on his "abiding by . . . all of Productions' . . . policies and procedures," as well as Productions' "instructions," which could "from time to time be changed." Defs.' Mem. at 3, 8. They further contend that, if "in Productions' judgment," Mr. Stephens was "unable or . . . failed" to perform his required services, including by breaching the Agreement or engaging in "activities . . . contrary to the instructions of Productions," the Agreement authorized Productions to terminate his employment "at any time." *Id.* at 3, 8–9. According to the Defendants, the June 2021 letter merely "exercised [Productions'] option to extend" the 2019 Agreement "for an additional year" and did not "modify, much less abrogate," Mr. Stephens's continuing obligation to comply with Productions' policies and instructions. *Id.* at 3, 9. They therefore argue that the extension's reference to Mr. Stephens being "fully vaccinated" for purposes of his "day count" did not freeze Productions' health policies because the Agreement permitted Productions to amend its policies and instructions "from time to time." *Id.* at 8–10. In their view, "[b]y its terms, the 2021 Extension simply extended the terms of Stephens's employment" and did not otherwise alter "its terms and conditions or Stephens's compliance obligations." *Id.* at 10.

The Defendants also argue that the breach-of-contract claim may proceed, if at all, only against Productions because the 2019 Employment Agreement expressly states that it "is between ESPN Productions, Inc. ('Productions') . . . and Hunter Stephens." Defs.' Mem. at 11.

They contend that ESPN, Inc., Disney, and the Individual Defendants were not parties to the Agreement and therefore cannot be held liable for its breach. *Id.*

As to the Individual Defendants, they argue that corporate officers and employees cannot be held personally liable based solely on their positions or Mr. Calcinari's signature on Productions' behalf. *Id.* at 11. In support, they rely on *Joseph General Contracting, Inc. v. Couto*, which recognized that "[a]n authorized agent for a disclosed principal, in the absence of circumstances showing that personal responsibility was incurred, is not personally liable to the other contracting party." 317 Conn. 565, 579 (2015) (internal quotation marks omitted).

As to ESPN, Inc. and Disney, the Defendants emphasize that "[c]ourts generally treat a parent corporation and its subsidiaries as separate and distinct legal entities," and that contract law does not permit a party to sue a nonparty for breach merely because the nonparty has "a close relationship with the other party to the contract." Defs.' Mem. at 11 (quoting *Tucker v. American International Group, Inc.*, 745 F. Supp. 2d 53, 69–70 (D. Conn. 2010); *Northbound Group, Inc. v. Norvax, Inc.*, 795 F.3d 647, 651 (7th Cir. 2015)).

Finally, they argue that the Agreement's statement that, "[f]or purposes of the rights granted herein and the entities for which services are performed, 'Productions' includes Productions' parent, affiliated and subsidiary companies," merely affords those entities rights as third-party beneficiaries and does not make them contracting parties or impose contractual obligations upon them. *Id.* at 12. In support, they rely on *Stein Hall & Co. v. S.S. Concordia Viking*, which states that contracting parties may "extend certain contractual protections, such as the limitation on damages, to . . . third-party beneficiaries," but "cannot contract to bind an unconsenting third party." 494 F.2d 287, 291 (2d Cir. 1974).

In response, Mr. Stephens argues that the June 2021 extension expressly conditioned his "day count" on his being "fully vaccinated," and that, when the extension was executed, the term had a "settled and universally understood meaning: completion of the primary vaccination series." Opp'n at 4; see also Compl. ¶ 27. He emphasizes that boosters "were neither authorized nor recommended for the general workforce in June 2021" and argues that he satisfied the extension's express condition by receiving both doses of the Moderna vaccine. *Id.* at 4; see also Compl. ¶ 27.

According to Mr. Stephens, imposing a booster requirement created "a new, substantive condition of employment" because it required "an additional medical intervention not contemplated by the parties at the time of contracting." *Id.* at 4. He further argues that such a modification was unenforceable because the Agreement provided that it could not be "changed, modified or discharged in whole or in part except by an instrument duly signed by Employee and Productions," and the Defendants identified no written, bilateral amendment authorizing a booster requirement. *Id.* at 4.

Mr. Stephens also argues that the Defendants' reliance on the general provision permitting policies and instructions to be changed "from time to time" would render the Agreement's express modification clause "illusory" and allow Productions to rewrite bargained-for contractual terms unilaterally. *Id.* at 5 (citing *Harbour Pointe, LLC v. Harbour Landing Condominium Ass'n, Inc.*, 300 Conn. 254, 261 (2011) (explaining that "[t]he contract must be viewed in its entirety" and that "every provision must be given effect if it is possible to do so" (internal quotation marks omitted))). At a minimum, he argues that "[w]hether any enforceable policy, directive, or instruction carrying contractual force existed is a factual question inappropriate for resolution on a motion to dismiss." *Id.* at 9.

Mr. Stephens further argues that the Complaint plausibly alleges a breach because "the Agreement required him to be 'fully vaccinated,' not boosted," he "satisfied that contractual requirement," and ESPN nevertheless "imposed a new booster requirement without a written amendment." Opp'n at 9–10. He contends that "no valid policy or contractual provision authorized that additional medical condition" and that ESPN terminated him for refusing to comply with "an unenforceable, non-contractual requirement." *Id.* at 10.

According to Mr. Stephens, these allegations "more than suffice to state a claim for breach of contract under Connecticut law" because the Employment Agreement did not authorize ESPN "to impose a booster mandate without a written amendment" and no "enforceable policy or instruction carrying contractual force existed." *Id.*[2]

The Court disagrees with Mr. Stephens.

The Court may consider the Employment Agreement and the June 2021 extension because "[a] complaint is [also] deemed to include any written instrument attached to it as an exhibit, materials incorporated in it by reference, and documents that, although not incorporated by reference, are 'integral' to the complaint." *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) (citation omitted). And although the Court ordinarily accepts the Complaint's factual allegations as true, it need not do so when those allegations are "contradicted by more specific allegations or documentary evidence from the Complaint and from the exhibits attached thereto." *Id.*

Indeed, "[t]he contract must be viewed in its entirety, with each provision read in light of the other provisions . . . and every provision must be given effect if it is possible to do so." *Harbour Pointe, LLC v. Harbour Landing Condominium Ass'n, Inc.*, 300 Conn. 254, 261 (2011)

[2] Notably, Mr. Stephens's response does not separately respond to the Defendants' argument that the breach-of-contract claim cannot proceed against the entities or individuals that were not parties to the Agreement.

(internal quotation marks omitted). Reading the vaccination language as permanently prohibiting Productions from revising its workplace health policies would deprive the policies-and-instructions provisions of effect. Reading the provisions together, by contrast, gives effect to both: the extension described the vaccination requirement applicable to Mr. Stephens's day count at that time, while the Employment Agreement continued to require him to comply with Productions' policies and instructions as they changed.

Read as a whole, the 2019 Employment Agreement required Mr. Stephens to perform his services subject to Productions' direction and control and to comply with Productions' policies, procedures, and instructions. The Agreement provided that Mr. Stephens "shall perform his services to the best of his ability, in accordance with Productions' direction and control, and subject to all of Productions' policies and procedures." Compl., Ex. A at 8, § 1. It further "expressly conditioned" his employment on his "abiding by . . . all of Productions' . . . policies and procedures" and required him to comply with Productions' "instructions," which could "from time to time be changed." *Id.* at 11–12, §§ 8(c), 16. The Agreement also authorized Productions to terminate Mr. Stephens's employment "at any time" if, "in Productions' judgment," he "is unable or . . . fails" to perform his required services, breaches the Agreement, or engages in "activities . . . contrary to the instructions of Productions." *Id.* at 10–11, § 8(a).

The June 2021 extension did not replace the 2019 Employment Agreement with a new agreement. Instead, Productions expressly "exercised its option to extend" the existing Agreement "for an additional year," from August 28, 2021, through August 27, 2022. Compl., Ex. B at 2. The extension referred to "the requirement that all Remote personnel be fully vaccinated against COVID-19 in order to be assigned to games and remote events" and addressed the effect of Mr. Stephens's vaccination status on his day count. *Id.*; *see also* Compl. ¶

27 (alleging that Mr. Stephens's "day count" would be contingent on his becoming "fully vaccinated"). But the extension did not state that the vaccination requirement then in effect would remain the exclusive permissible workplace health requirement throughout the extended term. Nor did it remove or alter the provisions requiring Mr. Stephens to comply with Productions' policies and instructions, including instructions that could "from time to time be changed." Compl., Ex. A at 11, § 8(c).

The parties' competing interpretations do not, without more, render the Agreement ambiguous because "the mere fact that the parties advance different interpretations of the language in question does not necessitate a conclusion that the language is ambiguous." *Cruz v. Visual Perceptions, LLC*, 311 Conn. 93, 103 (2014) (internal quotation marks omitted). Rather, "[a] contract is unambiguous when its language is clear and conveys a definite and precise intent." *Id.* at 103 (internal quotation marks omitted). Nothing in the extension states that Productions surrendered its express authority under the Employment Agreement to revise its policies and instructions. The extension therefore is not reasonably susceptible to Mr. Stephens's proposed interpretation.

Mr. Stephens's reliance on the written-modification provision does not alter this conclusion. Although "[a] written contract can be modified by a subsequent parol agreement if that is the intention of the parties," any modification still requires an agreement between the contracting parties. *New England Petroleum Corp. v. Groppo*, 214 Conn. 444, 450 (1990) (internal quotation marks omitted); see also *Joseph General Contracting, Inc. v. Couto*, 317 Conn. 565, 578 (2015) ("A modification to an existing contract can only be brought about by agreement of the parties to the contract to be modified."). In *New England Petroleum*, the Connecticut Supreme Court upheld the trial court's finding that "no agreement ever occurred"

because the evidence demonstrated only “an unsuccessful attempt by both parties to amend the original agreement,” which was “fraught with misunderstandings and incomplete articulation.” 214 Conn. at 451.

Similarly, “[i]n order to prove that a contract has been modified, the party asserting the modification must show mutual assent to its meaning and conditions.” *Joseph General*, 317 Conn. at 575 (internal quotation marks omitted). The Complaint does not plausibly allege that Mr. Stephens and Productions mutually assented to replace or alter the Employment Agreement’s provisions authorizing Productions to revise its policies and instructions. To the contrary, the June 2021 letter “exercised [Productions’] option to extend” the existing Employment Agreement “for an additional year.” Compl., Ex. B at 2. The extension did not remove the provisions requiring Mr. Stephens to comply with Productions’ “instructions,” which could “from time to time be changed.” Compl., Ex. A at 11, § 8(c). Its reference to the vaccination requirement then applicable to Mr. Stephens’s day count therefore does not plausibly allege an agreement that Productions would refrain from later revising its workplace health policies.

Nor does the booster requirement itself plausibly constitute a modification of the Employment Agreement. The Defendants do not rely on an alleged amendment to Mr. Stephens’s contractual term, compensation, required services, or the provisions governing termination. Instead, they rely on the Agreement’s existing provisions requiring Mr. Stephens to comply with Productions’ policies and instructions, including instructions that could “from time to time be changed.” Compl., Ex. A at 11, § 8(c). Applying those provisions did not substitute new contractual terms for the terms to which Mr. Stephens had agreed.

*Torosyan v. Boehringer Ingelheim Pharmaceuticals, Inc.*, 234 Conn. 1 (1995), does not require a different result. There, in addressing whether a subsequent employee handbook modified an implied employment contract, the Connecticut Supreme Court explained that, "[t]o be incorporated into the implied contract of employment," the subsequent handbook had to "constitute an offer to modify the preexisting terms of employment by substituting a new implied contract for the old," and "the proposed modifications, like the original offers, must be accepted." *Id.* at 14. The court further explained that, "for the new manual to have modified the preexisting terms of employment, the plaintiff must have consented to that modification." *Id.* at 17. Because the subsequent manual substantially interfered with the employee's legitimate expectations under the preexisting contract, the court "disagree[d] that the mere distribution of the manual and the plaintiff's continued work necessarily demonstrated his consent to the proposed modification of the preexisting contract." *Id.* at 17–18. The court therefore concluded that continued employment "may be relevant to determining whether [an employee] consented to the new contract, but cannot itself mandate a finding of consent." *Id.* at 19.

Here, by contrast, Mr. Stephens does not allege that his continued employment constituted acceptance of a subsequently proposed contractual modification. The Employment Agreement itself expressly subjected him to Productions' policies and instructions and provided that those instructions could change during the contractual term. Compl., Ex. A at 8, 11–12, §§ 1, 8(c), 16. Thus, unlike the subsequent manual at issue in *Torosyan*, the alleged booster requirement operated under an existing contractual provision authorizing Productions to issue and change policies and instructions. The Complaint does not plausibly allege the mutual assent necessary to establish a contractual modification.

The Complaint also does not plausibly allege a breach merely because Productions terminated Mr. Stephens after he declined to comply with the booster requirement. The Employment Agreement authorized Productions to terminate Mr. Stephens's employment "at any time" if, "in Productions' judgment," he failed to perform his required services, breached the Agreement, or engaged in "activities . . . contrary to the instructions of Productions." Compl., Ex. A at 10–11, § 8(a). Because the Complaint does not plausibly allege that the booster requirement fell outside Productions' contractual authority, it likewise does not plausibly allege that the resulting termination breached the Agreement.

As a result, because the Agreement required Mr. Stephens to comply with Productions' changing policies and instructions and authorized termination for noncompliance, the Complaint does not plausibly allege that Productions breached the Agreement.[3]

The breach-of-contract claim also fails against ESPN, Inc. Under Connecticut law, "[p]arties to a contract cannot thereby impose any liability on one who, under its terms, is a stranger to the contract, and, in any event, in order to bind a third person contractually, an expression of assent by such person is necessary." *Joseph General Contracting, Inc. v. Couto*, 317 Conn. 565, 578 (2015) (internal quotation marks omitted). The Employment Agreement expressly states that it "is between ESPN Productions, Inc. ('Productions') . . . and Hunter Stephens ('Employee')." Compl., Ex. A at 8. Consistent with that language, the Complaint alleges that "Plaintiff Hunter Stephens entered into an employment contract with ESPN Productions, Inc." and that "[t]he contract was executed by Chris Calcinari." Compl. ¶ 24. It does

[3] The Court need not and does not reach whether Productions properly evaluated the sincerity of Mr. Stephens's religious objection or whether the alleged conduct violated a separate statutory obligation. The question presented by this claim is whether the alleged conduct violated the Employment Agreement.

not allege that ESPN, Inc. signed the Agreement, expressly assented to its terms, or otherwise undertook contractual obligations to Mr. Stephens.

The Agreement's reference to Productions' corporate affiliates does not alter that conclusion. It provides: "For purposes of the rights granted herein and the entities for which services are performed, 'Productions' includes Productions' parent, affiliated and subsidiary companies." Compl., Ex. A at 8. Although a third party may acquire enforceable rights under an agreement to which it is not a named party, the relevant inquiry is whether the contracting parties intended "to create a direct obligation from one party to the [contract] to the third party." *Gateway Co. v. DiNoia*, 232 Conn. 223, 231 (1995). As the Connecticut Supreme Court explained, "[t]he ultimate test" for third-party-beneficiary status is whether "the intent of the parties to the contract was that the promisor should assume a direct obligation to the third party [beneficiary]." *Id.* (internal quotation marks omitted).

Here, the quoted provision identifies the entities entitled to "rights granted" under the Agreement and the entities "for which services are performed." Compl., Ex. A at 8. It does not state that those entities assumed Productions' obligations to Mr. Stephens or became parties to the Agreement. That distinction is consistent with *Stein Hall & Co. v. S.S. Concordia Viking*. There, the Second Circuit explained that a third party that "is not a party" to a contract "is not bound by [its] terms unless it contracts to be so." 494 F.2d 287, 291 (2d Cir. 1974). The court further explained that contracting parties may "extend certain contractual protections" to third-party beneficiaries, but "they cannot contract to bind an unconsenting third party." *Id.*

The Complaint's allegations concerning the corporate relationships among Productions, ESPN, Inc., and Disney do not plausibly allege the required assent. The Complaint alleges that Productions "is a subsidiary of Defendant ESPN, Inc.," that ESPN, Inc. "is controlled and

operated by its majority owner" Disney, and that Disney owns an "80% stake" in ESPN, Inc. Compl. ¶ 17. It further alleges that ESPN's corporate policies "were substantially guided by Disney." *Id.* ¶ 36. But allegations of ownership, control, affiliation, or policy coordination do not allege that ESPN, Inc. or Disney agreed to assume contractual obligations under Mr. Stephens's Employment Agreement. As *Joseph General* makes clear, "in order to bind a third person contractually, an expression of assent by such person is necessary." 317 Conn. at 578 (internal quotation marks omitted). The Complaint identifies no such expression of assent by ESPN, Inc. The Agreement contains no language expressing an intent that ESPN, Inc. or Disney assume obligations directly to Mr. Stephens.[4]

The breach-of-contract claim also fails against Mr. Calcinari and Ms. Leone. An agent acting for a disclosed principal ordinarily does not become personally liable under the principal's contract. *Scribner v. O'Brien, Inc.*, 169 Conn. 389, 404 (1975) ("It is true that the agent is not liable where, acting within the scope of his authority, he contracts with a third party for a known principal."). Likewise, "[a]n authorized agent for a disclosed principal, in the absence of circumstances showing that personal responsibility was incurred, is not personally liable to the other contracting party." *Joseph General*, 317 Conn. at 579 (internal quotation marks omitted).

The Complaint does not plausibly allege that either Mr. Calcinari or Ms. Leone personally undertook contractual obligations to Mr. Stephens. It alleges that Mr. Calcinari was ESPN's Senior Vice President of Remote Production Operations and that Ms. Leone was an Employee Relations Manager at ESPN, Inc. Compl. ¶¶ 5–6. It further alleges that Mr. Calcinari

---

[4] Although the Court has dismissed the claims against Disney for lack of personal jurisdiction and therefore does not reach their merits, the breach-of-contract claim against Disney would fail for the same reason. The Agreement identifies Productions and Mr. Stephens as the contracting parties and does not state that Disney assumed a direct contractual obligation to him. *See* Compl., Ex. A at 8.

and Ms. Leone terminated Mr. Stephens's employment while "acting in their capacity as agents of ESPN." *Id.* ¶ 18.

Although the Complaint alleges that Mr. Calcinari "executed" the Employment Agreement, *id.* ¶ 24, the Agreement identifies Productions, not Mr. Calcinari, as the contracting party. Compl., Ex. A at 8. Indeed, the Agreement reflects that Mr. Calcinari signed on behalf of Productions, rather than in his individual capacity. The Complaint does not allege that he separately agreed to undertake personal contractual obligations to Mr. Stephens.

The Complaint alleges that Ms. Leone denied Mr. Stephens's exemption request and that he later was "officially terminated via email by Defendant Leone." Compl. ¶¶ 35–36. Those allegations describe Ms. Leone's participation in the employment decisions at issue, but they do not allege that she was a party to the Employment Agreement or personally assumed any of Productions' contractual obligations. The Complaint does not allege that Ms. Leone signed the Employment Agreement or otherwise manifested assent to become personally bound by it.

*Joseph General* is particularly instructive. There, the Connecticut Supreme Court rejected individual contractual liability even though the corporation's president had signed the construction contract on the corporation's behalf and had extensive personal involvement in the parties' dealings. 317 Conn. at 579–83. The court emphasized that "[t]he fact that his name was not on the original construction contract in an individual capacity is indicative of the fact that no personal liability was intended." *Id.* at 579. Ultimately, because "[t]here [was] simply no evidence that Silvestri was acting as anything other than an agent for Joseph General," the court concluded that "there [was] no legal basis to impose individual liability upon him." *Id.* at 583.

The same reasoning applies here. The Agreement identifies Productions as the contracting party, Mr. Calcinari's execution of the Agreement was on Productions' behalf, and

nothing alleged in the Complaint suggests that either Mr. Calcinari or Ms. Leone agreed to become personally bound by Productions' contractual obligations.

Accordingly, the Court will dismiss the breach-of-contract claim under Rule 12(b)(6) against all of the Defendants.

**D. The RFRA Claim**

RFRA provides that the "Government shall not substantially burden a person's exercise of religion even if the burden results from a rule of general applicability," unless the Government demonstrates that the burden "is in furtherance of a compelling governmental interest" and "is the least restrictive means of furthering that compelling governmental interest." 42 U.S.C. § 2000bb-1(a)–(b). A person whose religious exercise has been burdened in violation of the statute may "obtain appropriate relief against a government." *Id.* § 2000bb-1(c). RFRA defines "government" to include "a branch, department, agency, instrumentality, and official (or other person acting under color of law) of the United States." *Id.* § 2000bb-2(1).

Consistent with this language, the District of Connecticut has recognized that "[t]here is no binding Second Circuit precedent that requires applying RFRA to cases between private parties when the government is not a party." *Wisconsin Province of the Society of Jesus v. Cassem*, 373 F. Supp. 3d 378, 390 (D. Conn. 2019). Indeed, the court described Second Circuit precedent as "unclear as to whether RFRA can apply when the government is not a party and the law is enforceable only by private parties," and proceeded by assuming that RFRA applied. *Id.* at 389–90. Here, because Mr. Stephens seeks relief against nominally private entities and individuals on the theory that they acted under color of federal law, the Court considers whether the challenged conduct may fairly be attributed to the federal government.

The government-action inquiry begins by identifying "the specific conduct of which the plaintiff complains," rather than examining only "the general characteristics of the entity." *Grogan v. Blooming Grove Volunteer Ambulance Corps*, 768 F.3d 259, 264 (2d Cir. 2014) (internal quotation marks omitted). It is not enough to allege governmental involvement in "some activity of the institution alleged to have inflicted injury upon a plaintiff"; the plaintiff must allege that the government was involved "with the activity that caused the injury." *Sybalski v. Independent Group Home Living Program, Inc.*, 546 F.3d 255, 257–58 (2d Cir. 2008) (internal quotation marks omitted).

The actions of a nominally private entity may be attributable to the government when: "(1) the entity acts pursuant to the 'coercive power' of the state or is 'controlled' by the state"; "(2) when the state provides 'significant encouragement' to the entity, the entity is a 'willful participant in joint activity with the [s]tate,' or the entity's functions are 'entwined' with state policies"; or "(3) when the entity 'has been delegated a public function by the [s]tate.'" *Sybalski*, 546 F.3d at 257 (quoting *Brentwood Academy v. Tennessee Secondary School Athletic Ass'n*, 531 U.S. 288, 296 (2001)). Similarly, the Supreme Court has identified "a few limited circumstances" in which a private entity may qualify as a governmental actor, including "when the private entity performs a traditional, exclusive public function," "when the government compels the private entity to take a particular action," or "when the government acts jointly with the private entity." *Manhattan Community Access Corp. v. Halleck*, 587 U.S. 802, 809 (2019).

The required relationship must connect the government to the challenged decision itself. "[T]he mere fact that a business is subject to state regulation does not by itself convert its action into that of the State," and the plaintiff must establish "a sufficiently close nexus between the State and the challenged action of the regulated entity." *Blum v. Yaretsky*, 457 U.S. 991, 1004

(1982). The government ordinarily may be held responsible for a private decision only when it "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Id.* "Mere approval of or acquiescence in the initiatives of a private party" is insufficient. *Id.*

Government licensing, contracting, financial support, and regulation likewise do not, without more, convert private conduct into governmental action. As the Supreme Court explained, "[t]he fact that the government licenses, contracts with, or grants a monopoly to a private entity does not convert the private entity into a state actor—unless the private entity is performing a traditional, exclusive public function." *Manhattan Community Access Corp.*, 587 U.S. at 814. The Court applied the same principle to governmental funding or subsidies. *Id.* at 814–15. And "[p]ut simply, being regulated by the State does not make one a state actor." *Id.* at 816.

Entwinement also requires a sufficient connection between the government and the private entity's management or control. In *Grogan*, although New York was involved in the "creation, funding, licensing, [and] regulation" of volunteer ambulance organizations, the Second Circuit held that "that fact alone is insufficient to support a finding of state action with respect to the disciplinary actions that form[ed] the basis of Grogan's complaint." 768 F.3d at 268. The town did not appoint any portion of the organization's board, have "any say in [its] management or personnel decisions," or play any role in the disciplinary process. *Id.* at 269. The court therefore concluded that the town was "not sufficiently entwined with BGVAC's management" to render the suspension state action. *Id.*

As to RFRA's express inclusion of a federal "instrumentality," *Gardner-Alfred v. Federal Reserve Bank of New York* applied the framework derived from *Lebron v. National*

*Railroad Passenger Corp.*, 513 U.S. 374 (1995), under which a corporation created by special law may be governmental when it was created to further governmental objectives and the government retains permanent authority to appoint a majority of its directors. 651 F. Supp. 3d 695, 710–11 (S.D.N.Y. 2023). There, the Federal Reserve Bank qualified because it was "specifically created by Congress to further a key governmental objective" and Federal Reserve Banks were overseen by a Board of Governors composed of presidential appointees confirmed by the Senate who possessed "enumerated powers to control their operations." *Id.* at 710–11.

The Defendants argue that Productions, ESPN, and Disney are "traditional private entities" and that the Complaint does not plausibly allege that any of them acted under color of federal law when Productions applied the booster requirement, denied Mr. Stephens's exemption request, and terminated his employment. Defs.' Mem. at 14. They contend that a private entity may be treated as a governmental actor only if the government became entwined in its management and control, coerced or significantly encouraged the challenged conduct, delegated a traditionally and exclusively governmental function to it, or jointly participated with it in violating the plaintiff's rights. *Id.* at 15 (citing *Stefanoni v. Darien Little League, Inc.*, 101 F. Supp. 3d 160, 173–75 (D. Conn. 2015); *Sybalski*, 546 F.3d at 257; *Grogan*, 768 F.3d at 264–69).

According to the Defendants, the Complaint alleges no facts showing that the federal government exercised "management or control" over the corporate Defendants or that Productions' employment decisions carried out "governmental policies." *Id.* at 15–16 (quoting *Grogan*, 768 F.3d at 268). Nor, they argue, does the Complaint allege that the government "exercised coercive power or . . . provided such significant encouragement, either overt or covert," that Productions' application of the booster requirement "must in law be deemed to be that of the State." *Id.* at 16 (quoting *Blum*, 457 U.S. at 1004). Rather, they contend that the

Complaint and its exhibits show that Productions, acting through Mr. Calcinari and Ms. Leone, enforced the booster requirement, denied the exemption request, and terminated Mr. Stephens. *Id.* at 14.

The Defendants further argue that the alleged federal directive could not plausibly have compelled the challenged employment decisions because the directive "says nothing about a booster shot" and the Supreme Court blocked its enforcement on January 13, 2022, "almost a full month before Productions denied Stephens's request." *Id.* at 17. They contend that, even had Productions complied with a federal vaccination requirement, following government regulation would not convert its private employment decision into governmental action. *Id.* (citing *Manhattan Community Access Corp.*, 587 U.S. at 816; *Ciraci v. J.M. Smucker Co.*, 62 F.4th 278, 283 (6th Cir. 2023)).

Likewise, they argue that allegations concerning Disney's historical relationship with the Department of Defense, former government employees and contractors serving as corporate directors or executives, the Ad Council campaign, and other public-private partnerships do not show that the federal government had any "'say'" in Productions' "'internal decision making'" or any "'role in enacting or enforcing'" the booster policy. *Id.* at 18–19 (quoting *Pearson v. Shriners Hospitals for Children, Inc.*, 133 F.4th 433, 444 (5th Cir. 2025)). Nor, in their view, do those relationships plausibly allege that the corporate Defendants were "willing participants" in "an agreement or meeting of the minds" with the federal government to violate Mr. Stephens's rights. *Id.* at 21. Those are the authorities and formulations relied upon by the Defendants in their memorandum. The Defendants therefore contend that the Complaint identifies no specific federal involvement in Productions' decision to impose the booster requirement, deny Mr. Stephens's religious exemption, or terminate his employment. Defs.' Mem. at 22.

In response, Mr. Stephens argues that the challenged policy arose from what he characterizes as “a full-court press by the government and by Disney top brass,” and that companies including Disney responded to the Biden Administration’s proposed vaccination requirement “as if it was a Commandment.” Opp’n at 21. He argues that Disney and ESPN acted “in concert with and as a necessary agent of the executive branch” and became “‘a willful participant in joint activity with the State or its agents.’” *Id.* at 22 (quoting *United States v. Price*, 383 U.S. 787, 794 (1966)).

According to Mr. Stephens, the corporate Defendants were “entwined with governmental policies” because “the CDC, a government entity, promoted its vaccination policy, Defendants adopted it”; the Biden Administration advanced a vaccination requirement affecting businesses with more than 100 employees, and the Defendants “adopted a stringent variation of it”; and, when the government sought “a strong promotion of the vaccination,” the Defendants shaped their messaging “to be in sync.” *Id.* at 23–24. He also relies on allegations that the government permitted Disney to use military equipment in its filmmaking, that Disney shaped its portrayal of the military favorably, and that Disney maintained “close connections with government officials” serving on its board or in senior management, including by hiring “the Biden Administration’s head of vaccine education.” *Id.* at 24–26. In his view, these relationships show that the Defendants’ policies were “in lockstep with [their] partner” and establish entwinement, significant encouragement, and joint activity. *Id.* at 24.

Mr. Stephens further argues that Disney and ESPN qualify as governmental actors and that the Individual Defendants acted under color of federal law by carrying out the challenged policy. *Id.* at 25–33. He contends that Disney’s executives “set the tone” and “set the expectations,” and that “[t]he extent to which [Mr. Chapek] influenced Calcinari and Leone is a

matter to be determined by the trier of fact." *Id.* at 25. As to Ms. Leone, Mr. Stephens argues that her actions involved "'such a close nexus between the State and the challenged action'" that her "'seemingly private behavior may be fairly treated as that of the State itself,'" and that she acted as a "'willful participant in joint activity with the State or its agents.'" *Id.* at 32 (quoting *Tancredi v. Metropolitan Life Insurance Co.*, 316 F.3d 308, 312 (2d Cir. 2003); *Ciambriello v. County of Nassau*, 292 F.3d 307, 323 (2d Cir. 2002)).

He maintains that RFRA reaches the Defendants because its phrase "color of law" "mirrors that found in 42 U.S.C.S. § 1983," and "Congress intended for RFRA 'color of law' analysis to overlap with § 1983 analysis." *Id.* at 33 (quoting *Listecki v. Official Committee of Unsecured Creditors*, 780 F.3d 731, 738, 740 (7th Cir. 2015)). Finally, Mr. Stephens argues that adjudicating governmental involvement on a motion to dismiss would be premature and that "[d]iscovery should be permitted to proceed to allow Plaintiff to further develop the facts." *Id.* at 23; *see also id.* at 31 ("As the case progresses, further factual investigation and discovery will be necessary to establish the full extent of the individual Defendants' roles in the decision-making process.").

The Court disagrees.

The Complaint contains extensive allegations describing relationships among Disney, ESPN, federal agencies, former government officials, private organizations, and public-health campaigns. *See* Compl. ¶¶ 37–108. But the relevant question is not whether Disney or ESPN ever worked with or collaborated with the federal government. The inquiry begins with "the specific conduct of which the plaintiff complains." *Grogan*, 768 F.3d at 264 (internal quotation marks omitted). Here, that conduct is Productions' requirement that Mr. Stephens obtain a

booster, its denial of his exemption request, and its decision to terminate him after he declined to comply. Compl. ¶¶ 19, 23, 35–36; Compl., Ex. D at 3.

The Complaint does not plausibly allege that the federal government managed, controlled, coerced, or significantly encouraged those particular decisions. *See* Compl. ¶¶ 37–45. The Complaint alleges that, in explaining the company mandate, the Defendants referred to the Biden Administration's announced policy "expecting companies with greater than 100 employees to mandate the vaccination." *Id.* ¶ 37. It further alleges that President Biden "called on leaders in the private and public sector to implement vaccine requirements" and stated: "If you're a business leader, a nonprofit leader, a state or local leader, who has been waiting for full FDA approval to require vaccinations, I call on you now to do that. Require it." *Id.* ¶ 43. The Complaint then alleges that Mr. Chapek discussed Disney's vaccination policy that same day and stated that Disney had "about a quarter of a million cast members that we'd love to see vaccinated." *Id.* ¶ 44.

These allegations establish, at most, that the federal government publicly advocated vaccination and that a private employer adopted a policy consistent with that advocacy. But "[m]ere approval of or acquiescence in the initiatives of a private party is not sufficient to justify holding the State responsible for those initiatives." *Blum*, 457 U.S. at 1004. A private decision is attributable to the government only when the government "has exercised coercive power or has provided such significant encouragement, either overt or covert, that the choice must in law be deemed to be that of the State." *Id.*

The Complaint does not allege that a federal agency directed Productions to impose a booster requirement on Mr. Stephens, instructed Productions to reject his religious objection, threatened Productions with consequences if it granted his request, or participated in the decision

to terminate him. Instead, the correspondence attached to the Complaint states that the booster requirement "was implemented based on the recommendations of scientists, health officials and [Productions'] own medical professionals" and constituted "a condition of continued employment." Compl., Ex. D at 3. The correspondence further states that Productions was "unable to conclude" that Mr. Stephens was "prevented from receiving the COVID-19 booster due to a sincerely held religious belief, practice or observance." Compl. ¶ 35; Compl., Ex. D at 3. These allegations attribute the challenged decisions to Productions and its medical professionals, not to federal direction, coercion, or participation.

The existence of governmental recommendations does not alter the source of the actual decision where the private entity retained responsibility for determining what action to take. In *Blum*, the challenged decisions "ultimately turn[ed] on medical judgments made by private parties according to professional standards that [were] not established by the State." 457 U.S. at 1008. Likewise, in *Sybalski*, although New York established procedures governing restrictions imposed by mental-health facilities, "the administrators of those facilities make the decision about whether such limitations should be imposed." 546 F.3d at 259. The Second Circuit therefore held that the State's involvement was "insufficient to render that decision 'state action' under the joint action test." *Id.*

The allegations concerning the federal vaccination directive reinforce rather than undermine that conclusion. According to the Complaint and the parties' submissions, the federal policy on which Mr. Stephens relies did not require a booster, and the Supreme Court had blocked enforcement of the private-employer requirement before Productions denied his exemption request. Those circumstances do not plausibly allege that the federal government compelled Productions to impose the particular booster requirement challenged here. The

relevant question remains whether there was "such a close nexus between the state and the challenged action that seemingly private behavior may be fairly treated as that of the state itself." *Cranley v. National Life Insurance Co. of Vermont*, 318 F.3d 105, 111 (2d Cir. 2003).

The Complaint also does not plausibly allege entwinement in the corporate Defendants' management or control. It alleges that Disney has a "symbiotic relationship with the Defense Department," describes the historical involvement of former military officials in Disney projects, and recounts other military and governmental collaborations. Compl. ¶¶ 38–40. It also alleges that former government officials and contractors later held positions with Disney and that Disney and ESPN participated with private and governmental organizations in public-service vaccination campaigns. *Id.* ¶¶ 42, 53–54, 59, 95, 97, 101.

But these allegations do not show that the federal government appointed Disney's or ESPN's directors, controlled their internal management, supervised Productions' personnel decisions, or participated in Mr. Stephens's exemption process. Rather, the Complaint alleges that Ms. Leone denied Mr. Stephens's exemption request and later terminated his employment. *Id.* ¶¶ 35–36.

*Grogan* is instructive. Although New York was involved in the "creation, funding, licensing, [and] regulation" of the private ambulance organizations at issue, the Second Circuit held that "that fact alone is insufficient to support a finding of state action with respect to the disciplinary actions that form[ed] the basis of Grogan's complaint." 768 F.3d at 268. The court emphasized that the town did not appoint any portion of the organization's board, have "any say in [its] management or personnel decisions," or participate in the disciplinary process, and therefore was "not sufficiently entwined with BGVAC's management" to render the disciplinary decision state action. *Id.* at 269. The allegations here describe an even more attenuated

connection between the federal government and the specific personnel decisions affecting Mr. Stephens.

The corporate Defendants also do not plausibly qualify as federal instrumentalities under the framework applied in *Gardner-Alfred*. There, the court applied the *Lebron* framework and concluded that the Federal Reserve Bank was a governmental instrumentality because it was "specifically created by Congress to further a key governmental objective" and was overseen by a federal Board of Governors whose presidentially appointed and Senate-confirmed members possessed "enumerated powers to control [the Reserve Banks'] operations." 651 F. Supp. 3d at 710–11. The Complaint contains no comparable allegations concerning Disney, ESPN, or Productions. Their contracts, collaborations, or communications with federal agencies do not plausibly allege that they were created by federal law to further governmental objectives or subjected to comparable federal control.

Additionally, Productions did not perform a traditional and exclusive governmental function. To qualify under the public-function doctrine, "the government must have traditionally and exclusively performed the function." *Manhattan Community Access Corp.*, 587 U.S. at 809. And "very few" functions fall within that category. *Id.* Adopting workplace health requirements, evaluating employee accommodation requests, and terminating private employment are not functions traditionally and exclusively performed by the government. That these decisions concerned public health does not transform them into governmental functions because it is "not enough that the function serves the public good or the public interest in some way." *Id.*

Finally, the Complaint does not plausibly allege joint participation in the challenged conduct. Under *Sybalski*, a nominally private entity may be treated as a governmental actor when it is a "willful participant in joint activity with the [s]tate," but it is not enough to allege

governmental involvement in some other activity of the private entity. 546 F.3d at 257–58. The government must have been involved "with the activity that caused the injury." *Id.*

The allegations concerning military-related projects, government-connected directors and executives, charitable initiatives, land use, and participation in public-health messaging do not identify federal participation in Productions' decision to require Mr. Stephens to obtain a booster, its evaluation of his exemption request, or its decision to terminate his employment. The alleged participation in the Ad Council's vaccination campaign does not establish otherwise. The Complaint alleges that Disney and ESPN participated with the Ad Council and the COVID Collaborative in the "It's Up to You" campaign and that those organizations collaborated with the CDC to promote public-service messaging concerning COVID-19 vaccination. Compl. ¶¶ 92, 95, 97, 99–101. But the Complaint does not allege that the campaign concerned Productions' booster requirement, its religious-exemption process, or Mr. Stephens's continued employment, much less that federal officials participated in those particular decisions.

Indeed, the correspondence attached to the Complaint states that the booster requirement "was implemented based on the recommendations of scientists, health officials and [Productions'] own medical professionals," not pursuant to an agreement with the federal government. Compl., Ex. D at 3. Under *Sybalski*, the relevant question is whether the government was involved "with the activity that caused the injury," 546 F.3d at 257–58, and under *Blum*, "[m]ere approval of or acquiescence in the initiatives of a private party" is insufficient, 457 U.S. at 1004. The allegations of public-health cooperation and shared support for vaccination therefore do not plausibly allege joint governmental participation in the employment decisions challenged here.

The Complaint connects the booster requirement, exemption process, and termination primarily to Productions, Mr. Calcinari, and Ms. Leone. It alleges that the booster requirement was a "corporate polic[y]" "enforced by Defendants Leone and Calcinari," that Mr. Stephens notified ESPN "via Defendants Calcinari and Leone" of his religious objection, and that Mr. Calcinari and Ms. Leone "wanted him to get a third shot." Compl. ¶¶ 19, 23, 36. It further alleges that Ms. Leone denied the exemption request because Productions was "unable to conclude" that Mr. Stephens was "prevented from receiving the COVID-19 booster due to a sincerely held religious belief, practice or observance." *Id.* ¶ 35; Compl., Ex. D at 3. According to the attached correspondence, Ms. Leone informed Mr. Stephens that the booster requirement "was implemented based on the recommendations of scientists, health officials and [Productions'] own medical professionals," constituted "a condition of continued employment," and would subject his employment and Employment Agreement to termination if he did not comply. Compl., Ex. D at 3. The Complaint then alleges that Mr. Stephens was "officially terminated via email by Defendant Leone" and that his employment had been "unilaterally terminated by" Mr. Calcinari and Ms. Leone "acting in their capacity as agents of ESPN." Compl. ¶¶ 18, 36.

But the Complaint does not allege that ESPN, Inc., Disney, the remaining Individual Defendants, or the Doe Defendants personally evaluated Mr. Stephens's exemption request, communicated the denial, or made the termination decision. Although it alleges generally that ESPN's corporate policies "were substantially guided by Disney" and that ESPN employees "were repeatedly subjected to Disney's directives regarding COVID-19 compliance," it does not identify any particular directive from Disney or the remaining Defendants requiring that Mr. Stephens's request be denied or that his employment be terminated. *Id.* ¶ 36. The allegations concerning the remaining Individual Defendants instead principally describe their corporate

positions, professional histories, board service, and relationships with governmental or private entities. *Id.* ¶¶ 8–12, 40–44, 61–72.

A claim is plausible only when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Complaint's allegations of corporate affiliation, professional history, and job titles do not permit that inference as to Defendants whom the Complaint does not connect to the specific exemption and termination decisions.

Because Mr. Stephens has not plausibly alleged action by the federal government, a federal instrumentality, or any Defendant acting under color of federal law, the Court need not reach whether the booster requirement substantially burdened his religious exercise or whether the requirement could satisfy strict scrutiny.

Accordingly, the Court will dismiss the RFRA claim against all Defendants under Rule 12(b)(6).

**E. Qualified Immunity**

The Second Circuit has applied qualified immunity to claims for individual-capacity damages under RFRA. "Any claim for damages against officials in their individual capacities . . . implicates the doctrine of qualified immunity," which "shields officials from civil liability so long as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Tanvir v. Tanzin*, 120 F.4th 1049, 1059–60 (2d Cir. 2024) (internal quotation marks omitted). Under this framework, qualified immunity shields a defendant from damages unless the plaintiff pleads facts showing "(1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Id.* at 1060 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)).

The Defendants argue that qualified immunity shields the Individual Defendants from liability because Mr. Stephens cannot establish both that an Individual Defendant violated his statutory right and that the right was "clearly established" when the alleged violation occurred. Defs.' Mem. at 25 (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011)). They contend that no "then-existing precedent" rendered it "beyond debate" that the Individual Defendants' challenged conduct violated RFRA. *Id.* (quoting *Shields of Strength v. United States Department of Defense*, 672 F. Supp. 3d 256, 284–85 (E.D. Tex. 2023) (finding the defendants entitled to qualified immunity on a RFRA claim)). According to the Defendants, "the absence of any binding precedent reflecting settled law that Productions' denial of Stephens's exemption request violated his RFRA rights is dispositive," and, in early 2022, the Individual Defendants had "no reason to expect that a court of law would deem them government actors in connection with Productions' implementation of its booster policy or deem Productions' enforcement of the policy as to Stephens a RFRA violation." *Id.* at 26.

Mr. Stephens responds that the Defendants "do not deny that if Defendants are state actors that the Religious Freedom Restoration Act ('RFRA') applies to them." Opp'n at 33. He argues that RFRA's phrase "'color of law' . . . mirrors that found in 42 U.S.C.S. § 1983," that § 1983 "applies to those acting 'under color of' law," and that "Congress intended for RFRA 'color of law' analysis to overlap with § 1983 analysis." *Id.* (quoting *Listecki v. Official Committee of Unsecured Creditors*, 780 F.3d 731, 738 (7th Cir. 2015)). Mr. Stephens therefore maintains that, "[a]s demonstrated above, Defendants qualify as state actors" and that, "[f]or this reason, Plaintiff's RFRA claim must not be dismissed." *Id.* The opposition does not separately address the Defendants' qualified-immunity argument or identify authority clearly establishing that the particular conduct alleged here violated RFRA.

The Court does not reach this alternative defense.

Whether a private defendant may invoke qualified immunity requires an inquiry distinct from simply assuming that the defendant is eligible for immunity because the defendant is alleged to have acted under color of law. In *Richardson v. McKnight*, the Supreme Court considered whether privately employed prison guards could claim qualified immunity and explained that *Wyatt v. Cole* directs courts "to look both to history and to the purposes that underlie government employee immunity in order to find the answer." 521 U.S. 399, 404 (1997). *See also Toussie v. Powell*, 323 F.3d 178, 183 (2d Cir. 2003) (quoting *Richardson*, 521 U.S. at 404). Applying that analysis to the circumstances before it, *Richardson* held that prison guards employed by a private prison-management firm were not entitled to qualified immunity. 521 U.S. at 412–13.

Consistent with that principle, the Second Circuit has held that "a private defendant faced with § 1983 liability for conspiring with state officials to violate federal rights is not protected by the doctrine of qualified immunity." *Toussie*, 323 F.3d at 183. The court reasoned that the logic underlying the denial of qualified immunity to private parties "applies as much to allegations that a private defendant conspired to influence improperly governmental decision-making as it does to allegations that a private defendant invoked an unconstitutional state replevin, garnishment, or attachment statute." *Id.* At the same time, *Toussie* expressly declined to decide whether qualified immunity would be available to all categories of private defendants, including private defendants acting under a government contract or court order. *Id.* at 184.

The Supreme Court subsequently confirmed in *Filarsky v. Delia* that private status alone does not foreclose qualified immunity. There, "[t]hough not a public employee, Filarsky was retained by the City to assist in conducting an official investigation into potential wrongdoing,"

and "[t]here [was] no dispute that government employees performing such work [were] entitled to seek the protection of qualified immunity." 566 U.S. 377, 393–94 (2012). In distinguishing *Wyatt*, the Court contrasted private individuals who had "no connection to government and pursued purely private ends" with "individuals working for the government in pursuit of government objectives." *Id.* at 392–93.

Thus, *Richardson*, *Toussie*, and *Filarsky* establish that the availability of qualified immunity to a nominally private defendant turns on the circumstances of the defendant's relationship with the government and the historical and policy considerations underlying the immunity, rather than following merely from an allegation that the defendant acted under color of law. *See Richardson*, 521 U.S. at 404; *Filarsky*, 566 U.S. at 389–94; *Toussie*, 323 F.3d at 183–84.

The Second Circuit's treatment of the issues in *Toussie* further confirms that the qualified-immunity inquiry may be distinct from the threshold question whether a private defendant acted under color of law. Powell argued both that he had not acted under color of state law and that he was entitled to qualified immunity. *Toussie*, 323 F.3d at 181. After resolving the qualified-immunity question, the Second Circuit declined to consider the remaining issues because they were not "inextricably intertwined with the issues that [the court] need[ed] to consider to dispose of his claim of qualified immunity." *Id.* at 184–85.

Here, the Court already has concluded that the Complaint does not plausibly allege that the Individual Defendants acted under color of federal law. The RFRA claim therefore fails regardless of whether the Individual Defendants would be eligible to invoke qualified immunity or whether the alleged RFRA right was clearly established in February 2022.

Accordingly, because the Court will dismiss the RFRA claim on the threshold federal-action ground, the Court declines to reach the Individual Defendants' alternative qualified-immunity defense.

**F. The Motion to Strike**

Under Rule 12(f), a court "may strike from a pleading an insufficient defense or any redundant, immaterial, impertinent, or scandalous matter." Fed. R. Civ. P. 12(f). "Whether to grant or deny a motion to strike is vested in the trial court's sound discretion." *Tucker v. American International Group, Inc.*, 936 F. Supp. 2d 1, 15 (D. Conn. 2013) (citing *Hollander v. American Cyanamid Co.*, 172 F.3d 192, 198 (2d Cir. 1999)). Such motions generally are "viewed unfavorably and rarely granted." *Id.* at 15–16 (quoting *Lord v. International Marine Insurance Services*, No. 3:08-CV-1299 (JCH), 2012 WL 45440, at *2 (D. Conn. Jan. 9, 2012)).

"'Immaterial' matter is that which has no essential or important relationship to the claim for relief," while "'impertinent' material consists of statements that do not pertain to, and are not necessary to resolve, the disputed issues." *Brady v. Basic Research, L.L.C.*, 101 F. Supp. 3d 217, 225 (E.D.N.Y. 2015) (citation omitted). "A scandalous allegation is one that reflects unnecessarily on the defendant's moral character, or uses repulsive language that detracts from the dignity of the court." *Id.* (citation omitted).

To prevail on a Rule 12(f) motion, the moving party must demonstrate that "(1) no evidence in support of the allegations would be admissible; (2) that the allegations have no bearing on the issues in the case; and (3) that to permit the allegations to stand would result in prejudice to the movant." *Id.* (quoting *Roe v. City of New York*, 151 F. Supp. 2d 495, 510 (S.D.N.Y. 2001)). Consistent with that demanding standard, the Second Circuit has instructed that courts "should not tamper with the pleadings unless there is a strong reason for so doing"

and that a Rule 12(f) motion based on immateriality or impertinence ordinarily "will be denied, unless it can be shown that no evidence in support of the allegation would be admissible." *Lipsky v. Commonwealth United Corp.*, 551 F.2d 887, 893 (2d Cir. 1976).

The Defendants argue that Paragraphs 37 through 108 should be stricken because they contain a "barrage of disjointed allegations" ranging from Disney's alleged work for the Federal Bureau of Investigation, to Isaac Perlmutter's efforts concerning veteran suicide, to an interview with LeBron James about his vaccination status. Defs.' Mem. at 32–33. They contend that these allegations are offered to support Mr. Stephens's assertion of a "public-private entwinement where Disney's news operations served as a delivery mechanism for state-sanctioned health messaging," but are "rooted in conjecture and hearsay" and have no bearing on whether Productions properly denied his religious-exemption request. *Id.* at 32–34.

According to the Defendants, Mr. Stephens does not claim that he heard, witnessed, or was privy to the alleged conversations or "entwinements," and instead relies on articles whose contents would not be admissible for their truth. *Id.* at 33 (citing *Howley v. Town of Stratford*, 217 F.3d 141, 155 (2d Cir. 2000) ("[T]estimony as to facts must generally be based on the witness's personal knowledge."); *Miro v. City of Bridgeport*, No. 3:20-cv-346 (VAB), 2023 WL 4992877, at *12 (D. Conn. Aug. 3, 2023) ("Newspaper articles are usually inadmissible hearsay.")).

The Defendants further argue that Mr. Stephens's "foray into eight decades of alleged corporate history" is superfluous and immaterial to a case concerning Productions' denial of a religious exemption from its booster requirement. *Id.* at 33–34. They rely on *Kidder v. Hanes*, which observed that "[a]verments of evidentiary facts or superfluous historical allegations may be subject to a Motion to Strike." No. 21-CV-1109S, 2023 WL 2992032, at *5 (W.D.N.Y. Apr.

18, 2023). They also contend that allowing the challenged allegations to remain would expand discovery, waste judicial resources, prejudice the Defendants, and obscure the issues actually presented. Defs.' Mem. at 34. In support, they cite decisions addressing the discovery burdens associated with collateral allegations and a decision striking extensive allegations concerning corporate history as "unnecessary," "burdensome to answer," and unduly prejudicial. *See In re Agent Orange Product Liability Litigation*, 475 F. Supp. 928, 936 (E.D.N.Y. 1979).

In response, Mr. Stephens argues that the motion to strike should be denied because, "[a]s discussed throughout, Plaintiff has sufficiently pled facts showing that Defendants qualify as state actors." Opp'n at 47–48. He therefore contends that the challenged state-actor allegations support his theory that the Defendants acted under color of federal law and concludes that the "Defendants' motion to strike should thus be denied." *Id.* at 48. He does not separately argue that the Defendants cannot establish that supporting evidence would be inadmissible or that the allegations are not scandalous or immaterial.

The Court agrees that the motion to strike should be denied, although for a different reason.

Because the Court will dismiss the RFRA claim and the remainder of the Complaint, the Court need not determine whether Paragraphs 37 through 108 independently satisfy Rule 12(f)'s demanding standard. Those allegations were pleaded in support of Mr. Stephens's theory that the Defendants acted under color of federal law for purposes of RFRA. *See* Compl. ¶¶ 37–108. But once the RFRA claim and the remainder of the Complaint are dismissed, there will be no continuing litigation in which those allegations could expand discovery, increase litigation expense, or otherwise prejudice the Defendants.

Rule 12(f) requires the movant to show, among other things, "that to permit the allegations to stand would result in prejudice to the movant." *Brady*, 101 F. Supp. 3d at 225 (quoting *Roe*, 151 F. Supp. 2d at 510). Because the dismissal of the Complaint eliminates the prospective prejudice identified by the Defendants, there is no need for the Court separately to strike the challenged allegations.

Accordingly, the Defendants' motion to strike the Complaint will be denied as moot.

## IV. CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss, ECF No. 32, is **GRANTED**, and Defendants' motion to strike, ECF No. 32, is **DENIED as moot**.

The claims against The Walt Disney Company, Bob Iger, Bob Chapek, Derica W. Rice, Susan E. Arnold, and Francis A. deSouza are **DISMISSED** without prejudice under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction.

The breach-of-contract and RFRA claims are otherwise **DISMISSED** without prejudice under Federal Rule of Civil Procedure 12(b)(6).

To the extent the deficiencies described in this Ruling and Order can be remedied, a proposed Amended Complaint must be filed by **September 11, 2026**. If a proposed Amended Complaint is not filed by **September 11, 2026**, the claims will dismissed with prejudice.

**SO ORDERED** at New Haven, Connecticut, this 14th day of August, 2026.

/s/ Victor A. Bolden
VICTOR A. BOLDEN
UNITED STATES DISTRICT JUDGE